25-5046. Mr. Lund. May it please the court again. This case involves whether the appellant, Mr. Fabian Cobos Carpena, met his burden to establish entitlement to address defense instructions, which would be prospectively given to a jury. There was a hearing and he, the court, ruled against his ability to present those instructions. And so he then entered a plea based on that to be reviewed by this court over this issue. The right to defend has been described in the Hernandez-Hernandez case as the keystone of our legal defense system. And with regard to a situation like this, where duress defense is at stake, this court in Haney held that a defendant is entitled to instructions on duress if it's supported by the evidence in the law and that the testimony most favorable to the defendant should be accepted. In Dixon, which was cited in the Haney case, which is a Supreme Court case, the district court must give full credits to the defendant's testimony. In a duress defense case, a party is required to meet three elements. And our argument is that the defendant in this case, under these special circumstances, presented sufficient evidence that should have been given full credits, such that the duress instructions should have been given to that prospective jury. Well, counsel, what's unusual about this case, as you well know, is that we're not dealing with the typical duress situation, which is very telescoped in time. Here we're talking about duress not in a moment, not even in a day. We're talking about duress spanning a lengthy period of time, approximately 10 years. And in terms of making the showing on duress for that period of time, one question that struck me is whether—well, it reminded me a little bit of battered spouse syndrome cases, where the question is, well, why does the battered spouse stay and not leave? And as you know, through your experience in cases like that, typically expert testimony is needed on that question. And it seemed to me that there was a similar question here, because here was Mr. Carpagna. He's under threat. He's under the thumb of Ms. Torres and her colleagues, if you will. But it's a long time, and he's got employment. He's running errands. He's not always in the home. And you might ask the question, well, why does he stick around? He didn't have opportunity to leave, but he didn't. And in trying to answer that question, it just struck me, why wouldn't you need some expertise, some expert evidence, to support your position that he was under duress for 10 years and never really had an opportunity to—meaning a reasonable opportunity to escape? Well, that evidence is not there. Obviously, there's not an expert there to say that he was a battered spouse or whatever you might want to call it. Well, I guess just to simplify my question, to meet your burden under these circumstances, why wouldn't that be necessary? I think the evidence itself was substantial, that he did face a situation where he was under immediate threat for that entire— and it's really a 13-year period of time. Do you think that that threat to him was meaningful enough, or do you think the threat to the sister was the key? No, I think the threat to him was meaningful. So he—and we're talking about lots of things that have happened to him. So teeth have been knocked out. The family talks about that there's continual bruising on his body. He has had a broom handle across his back. He's been poisoned. He's been drugged. He's had a knife put to his throat and told that if he doesn't do exactly what Ms. Torres wants him to do, either she's going to kill him, but most likely she's just going to have him sent back to Mexico, where it might be a lot easier to have him killed. And he has every reason to believe that that's going to happen to him, because after three years, when at that time he's only 19, he's involved in stealing cars based on what Ms. Torres tells her to do. And he does attempt to get the police involved and tell them that over those previous three years he had been traumatized physically and psychologically by this woman, and they didn't do anything. So they send him. He gets deported back to Mexico. And immediately after he goes across the border, he's apprehended by people who are affiliated with Ms. Torres. And for three weeks he is tortured and almost killed. And then at the end of those three weeks, they take him back across the border. And who's waiting for him but none other than Ms. Torres, who then takes him back to her place in either Tulsa or Oklahoma City and starts this same process again. And it continues for 10 years. So it seems like part of your case is built on the idea that he really, during that 10-year period and up until the time that he started going to these meetings, he really didn't know what to do to get help. Is that fair? I think, obviously, he's gone to the police after three years and they do not help him. That doesn't seem to be an appropriate avenue for him. Well, let me ask it a different way. So what I'm concerned, as I read your briefing, at least part of it is he actually did it when he could because until he escaped and started talking to people, he didn't know what to do to get help. And so, I mean, is that fair? That's somewhat fair. It's very similar to the Contento Pachon case, which involves the fellow from Bogota, Colombia, where he's dealing with the cartel members. He doesn't feel like he could just go to the police because the police are corrupt. The police are not corrupt here, but they're not sympathetic. Right. And they just wind up sending him back to Mexico. I mean, at all times he could have gone to ICE or some immigration authority. But that only leads to getting sent back to Mexico and getting tortured again. No, I understand that, but too bad. I mean, that's what he's got to report. Any report is going to put him at risk of being sent back. He did that in 2013. I understand that happened in 2013. But what I'm concerned about is that your argument leads to the possibility that anybody, I mean, being fearful that you're here illegally and that you can't report to ICE because of that seems to me a real problematic position, because that's technically probably who you're supposed to report to, because you need to file some kind of an asylum claim or try to receive some kind of protection from the U.S. government. And what I'm worried about is that where we're going with this is he didn't know where to report. He didn't know what to do. So, ergo, the length of time it took him to report is excusable. And the fact that he didn't go to the proper place to report and file asylum earlier was because he didn't know about it. That would leave it where everybody could just claim, well, I didn't know where to go to get help, so it was excused. It's okay that it took me a long time. Now, again, I think he's closer to the Contento-Pachon case where he's under constant surveillance during that 13-year period. But that's belied by the facts. And he was not under constant surveillance. He left to work every day for like six years. To a landscaping crew that if he didn't, which was, again, run by Ms. Torres, and if he's not doing exactly what he's supposed to do, either he's going to get his throat slit or he's going to get sent back to the folks in Mexico. I didn't see that it was her landscaping crew was in the record. Well, I don't have any. You're probably right. It would surprise me if she's not connected with the landscaping crew. Okay, but we don't know that. We may not know that. We've got to depend on what's in here. Okay. And what he does do, I think, is it turns out to be quite reasonable. Within a month of the time he's able to crawl away from her, and even during that month while they're in the process of shooting up her house or she's trying to run him over while he's walking down the street or her men are pulling guns on him as he's walking down the street, he does respond to her protective order because she's concerned that he's going to spill the beans on her, maybe in a court process. And so he does go to court, and that qualifies as a law enforcement agency under the holdings of the Tenth Circuit. You don't have to go to ICE. And he tells the court this is what's happening, and he finally gets a sympathetic ear. And during the next two months, he goes back to the court no fewer than three more times telling them exactly what's happening. So does it make a difference that he went to court to try to receive some protection from her hurting him? I mean, that's the purpose of responding, right? Yes. And the purpose of filing his own protective order motion. Yes. And not to receive some kind of official protection from the government on being retaliated against or being deported or receiving some official protection from the U.S. government. Well, again, he's not highly sophisticated. This is mostly a Spanish-speaking person. See, this is what was concerning me. Yes. Because now the level of sophistication of everybody is going to be an issue in every case on whether their reporting was sufficient or timely. He obviously is talking to court officials, and they easily could have said, let's take you over to ICE. But they did not do that. He did do what he's required to do, which is go to law enforcement officials. And so he's done that. But he was required to do so at his first opportunities, at his first reasonable opportunities. I'm not sure he did that. Well, I would like to think that he did, frankly. He's crawled away from her on April 30, 2023, and he is in court responding to this protective order petition on May 22, 2023. He goes back to court on- Well, he had been under her thumb some period of time by then. Well, no, the 10 years prior to that was the time when she's- That's the time I'm concerned about. So there's no indication that if he doesn't do exactly what he's told to do, he's going to be- Her plan is to send him back to Mexico. And actually, she gets to get her plan done, because the way he gets arrested is that she makes a claim that he's assaulted her. And as he has presented his materials to the INS hotline and has his lawyers having prepared his asylum application, she gets to get him arrested, and then we start this process. And so now he's looking at going back to Mexico, where he's likely going to get killed. So this court is going to honor her plan, which is you don't do what I want you to do, I'm going to get you killed. Why doesn't the government have a good argument that once he escaped on April 30, 2023, he was no longer under duress? Or at least he had a reasonable opportunity to escape the threat. He is under duress because he's shooting up his sister's house, and they're driving by as he's walking down the street, putting guns in his face. So he's under constant duress, even during that period of time. To me, that's the problem. We just say duress is kind of a loose concept that if you've got a threat, which these people live under threat all the time. Almost all of them can say they're under threat. And so I just have trouble knowing where to draw the line, where they don't have the reasonable opportunity, not to say it's threat-free or fear-free, but it says reasonable opportunity to call the authorities. My time, is that my answer to the question? Please. Yes. And the answer is that he basically was under threat during that time. He was able to get to a law enforcement authority within a reasonable period of time. He did not put it off. And if you want to do it on a sort of day-to-day basis, which is what the government is going to argue well on, May 1st he didn't go to the police because he'd gotten away from her. I don't think that that's the answer, because she's still in the process of shooting up his sister's house and having her men come up to him with guns. And so I think he did, within a month, he is starting this process of telling law enforcement what's happened to him. And admittedly, he does have a more lenient situation, but he's already notified the law enforcement authority. I think we understand the facts. Thank you. Thank you. Thank you, counsel. Mr. Anderson. May it please the Court. Elliot Anderson for the United States. A true duress defense does not have any daylight in it. The Supreme Court tells us in Bailey that the minute the duress loses its coercive force, you have to comply with the law. That's an indispensable element of a duress claim. That's why, in Al Rukabi, this Court said that duress defenses and necessity defenses should be used parsimoniously, because as soon as the duress loses its coercive force, the defendant has to comply with the law. Here, what that required was Mr. Cobas Carpena to either surrender to law enforcement or simply go to Mexico himself and leave the country. Mr. Cobas Carpena had been deported once already. He's familiar with the legal system. He knows who does the deportations. When he went into the courtroom to seek a protective order and mentioned in that application, Ms. Torres is threatening me with deportation because I don't have papers and I don't want to be deported. I want to be safe from her so that I can stay here. That's not surrender. That is mentioning to someone in a law enforcement context that you're undocumented. But if he had walked into court and said, Ms. Torres is forcing me to steal cars, and nobody did anything about it, that wouldn't be a license for him to continue stealing cars. He hasn't surrendered at that point. He's just mentioned that he's violating the law. But he hasn't stopped violating the law. And that is what the duress defense requires him to do. The minute he has any choice, stop breaking the law. Either turn himself in. When did that happen? When did he have that choice, in your view, based on the evidence? The district court found that he reasonably could have done any of those things that he did during that last year during the previous 10 years. He could have sought a protective order. He could have sought domestic partner counseling. He could have applied for a T visa. Those options were just as available to him earlier than later. So the government's position is over that period of 10 years, because what the cases look at is, were you alone for as short a period of time as 30 minutes? Because the cases in Appellant's reply brief in Cornelius know it was in glass. Well, it sounds like you're rejecting just the overall premise of the argument that someone who is under the type of threat that he was under, from his torus, threat of death or serious bodily injury, on a continuous basis, is not a viable argument at all. Is that what you're saying? That is what the district court said and the government agrees. Well, I know that's what the district court said. The government agrees with that. It is not objectively reasonable to say that Ms. Torres' henchman had complete control over the entire continent. Well, aren't we supposed to view the evidence on something like this issue in the light most favorable to Mr. Carpagna? Indeed, and it must be objectively reasonable as well. He must have an objectively reasonable fear and belief that he has. Well, if he's been told that he's going to be killed if he gets out of line, why isn't it objectively reasonable to think that he was under duress? Because this court has answered that question already and said that these facts are well to the left of facts that were not sufficient for duress. So you were threatened three years ago in El Salvador. That's not imminent. That's attenuated. Six years ago, you were threatened by a long-distance phone call. That's not an imminent threat. Well, that isn't his argument. His argument is that the threat started and it never ended and it was repeated. So it doesn't sound like the examples you're giving really fit this situation. But you said that you've got cases. What do you think is your best case for your position? Portillo-Vega is. I mean, there are many good cases. This is not a new issue. But Portillo-Vega is a very good case. The court said, look, Mexico is a big place. You could have gone to a lot of other places, and it's not credible for you to submit that anywhere you go in the whole country of Mexico, you're going to be snatched up and murdered. Nobody has that kind of power. Well, you say this is not a unique case. I'm beginning to wonder about that given the evidence that was presented. Are any of the cases you're relying on cases where at least the argument is that, look, 10 years, 13 years, whatever it is, is a really long time, but look at what happened during that period of time. I was under constant threat. Do any of the cases respond to that type of argument? So constant threat, Your Honor, shows up in three cases. In Haney, which was a prison escape, and there the threat was constant because the two individuals there were locked up in prison with the people who were threatening death or seriously bodily injury. So because they're incarcerated, they're locked up in that controlled environment with people who are threatening to murder them. The court found, yes, you were under duress there. In Contento-Pachon out of the Ninth Circuit, I'm sorry. Again, this was, Judge Matheson, what you were talking about. Contento-Pachon was a telescoped focused instance of duress. The drug trafficker came to the defendant and said, we know where your wife and daughter are. We will kill them unless you get on this plane right now. And the whole time you're on the plane, we'll be watching you, so don't talk to the police. But it was one trip. It was a controlled environment, and he legitimately was told that he was under constant surveillance and threat for the time it took to make that one trip. The third case where constant duress comes up is the Marcelino case, where the defendant claims, I didn't know. I was walking across the border. I thought I was going to go do a job. And then when I tried to turn around and go home, the human trafficker said, I will stab you in the desert and leave your body right here if you don't keep walking. And so he said, I kept walking. That is a constant threat. But there are no cases finding duress, finding that immutable threat, where it goes on for a prolonged period of time. So the case is in Appellant's reply brief. In Scott, the defendant was involved in a drug conspiracy for 125 days. And the court said, you could have done something else. You had other options during that time. Do you think it's impossible to be under duress for 10 years? Under the legal standard that's established here, I would say unless a person is locked up in, you know, a bordello or a shipping container and truly has no agency, it's all but impossible. Here we've got Mr. Cobos-Carpeña going to work, buying a truck, visiting family, right? He had letters come in from his sister and his parents. He's part of a community. He's not under lock and key. He doesn't have a gun to his head every minute of the day. And especially by that last year of his life when he leaves and Ms. Torres says, you're of no use to me. Get out. And then he sets about trying to establish himself and continue living illegally in the United States and not doing what the law requires him to do, which is to surrender or return to Mexico. What if he had gone to the police department and say, I'm here illegally. I surrender. I mean, is going to the local PD sufficient? If he had done that, do you lose? If he had gone to the police and said, I surrender, take me in, send me back to Mexico, I think the way things work in Tulsa County, the police would have picked him up and handed him over to ICE and he would have been removed. But if he had tried to surrender, yes, that would be closer to compliance. Here, seeking a protective order so that he can stay in the United States and not be threatened with deportation is not an attempt to surrender. Okay. Is there a – I'm troubled when the concept of duress, which I think originated, at least I thought it has this family history, in an immediate physical duress. You know, here's a gun pointing at your head. You get on the phone and tell somebody you need ransom money or something like that. When it morphs from that into a situational, emotional duress, it kind of loses anchor points. And I'm wondering what case law there is out there that discusses additional guide rails that have to be put on when the word duress, which is considered a cookie-cutter, one duress fits all, isn't really a cookie-cutter concept. If it moves out of the physical duress, I'm going to break your arm right now, to a situational duress, it seems to me we really ought to be looking at that as a different kind of an animal of duress. I'm not saying it could never happen. I think maybe if you had a mentally impaired person that couldn't distinguish reality or not, they might be more vulnerable to a long-term situational duress. But for most people, I'm really troubled about the open-natured concept that is being argued here. I agree, Your Honor, because the test as written, and the test as this Court has applied it over and over again, is we need a serious threat of imminent death or serious bodily injury. I don't think serious threat is the answer because, my gosh, I credit the fact that all these people have serious threats on them. I mean, that doesn't do it. Well, but what was missing here is it wasn't an unrelenting threat of death or serious bodily injury every minute of the day. Yeah, and I don't think that's realistic either. I mean, say you play this recording of my threat of death to you every 15 minutes or you'll get killed. I'm just troubled about one-size-fitting-all duress. I'm just wondering if there's any case law out there that says, look, there's got to be some more guide rails when it is a situational duress which could last forever, and that's not what duress really is intended for. Is there cases or is there argued articles or any discussion of what kind of guide rails we might impose? The best guide rails I can point the Court to or will adhere to, in Al Rukavi, this Court said, look, duress doesn't arise from a choice of several courses of action. If you've got options and any one of them is not illegal, then you have to take that non-illegal option. You're not under duress. And then in Salvador Munoz, this Court said that a defendant's subjective belief that he has no alternatives is not sufficient to send the question to the jury. There needs to be some objective evidence that he truly had no options. What about Dixon? What does Dixon do for you? Supreme Court case. I apologize, Your Honor. I'm not recalling the details of that one off the top of my head. That's fine. I would note, out of the cases that the appellant cited in his reply, they only underscore that the district court did not abuse its discretion here. In Glass, the woman was caught up in a drug trafficking operation, and the evidence was that the drug trafficker came to her door and said, you're going to run these drugs for me or I'm going to kill you and your daughter. Oh, wait, I'll be right back. And then he left for 30 minutes. And then he came back with the drugs and put her on a plane by herself. And the Court said, look, she had 30 minutes. It's not a lot of time, but that would have been time for her to do something other than just go along. So 30 minutes. In Gordon, the appellant's case, four and a half hours. The defendant was left alone for four and a half hours one morning. That was enough time for him to escape. He was no longer under duress. The chain was broken. So the cases that we've got where 125 days, four and a half hours, 30 minutes, three years, six years, six months, when there's that much time involved, it's not true duress. True duress, the quintessential case is I've got your kid here in the van, and I'm going to kill your kid if you don't go rob the bank. Do it now. That's duress. It's not being in an abusive home environment where someone is, you know, The question is, it's being phrased and it's being argued a little bit that duress is when we're forced to make a risky decision. But life is filled with situations where there is no non-risky decision available to you.  And if we're going to say that a risky decision is equal duress, that just doesn't seem to have guide rails on it. I agree, Your Honor. And that's why I think death and serious bodily injury is the real standard. Mr. Carpagna says this. Is it just risk of serious bodily injury? Because I think everybody that deals in illegal immigration and drugs is under serious bodily injury risk all the time. But isn't there an immediate question also of immediate bodily injury? It does need to be an imminent threat. And doesn't imminent carry some weight that, yes, we know you're under a threat. You chose this life. It was thrust on you. And it's a dangerous, risky life. And we're sorry about that. But if that equals duress, you have a get out of jail card to do anything you want. It would seem so. We've got to give some. But I think the guide rails might be on immediate that you may have to make an unpleasant decision. But if you have the ability to do so, it's not duress. I would agree, Your Honor. And the cases here from this court say, look, you were picked up by dirty police in Mexico two years ago. That's not imminent. Someone called you from across the country on the phone and threatened you. That's not imminent. You were beaten up and threatened in El Salvador three or six years ago. That's not imminent. And so what's lacking here is there was not ten years of imminent threat of death or serious bodily injury that prevented Mr. Carpagna from surrendering or returning to Mexico. So throughout, I would say, the whole ten years, but certainly throughout the period, he admits it's the last year when he was out of Ms. Torres' house and was acting independently and did not surrender and did not return to Mexico. Well, what about the sister situation when he was during that last year? I believe what the judge said is it wasn't really clear that his family was being threatened. May I respond briefly? Please. Was being threatened by Ms. Torres. There were pictures of some bullet holes or what looked like holes in the house, but there wasn't any evidence as to who or where those came from. As I recall, the judge did not find that there was a credible threat to his family from Ms. Torres there. Thank you. Thank you. I think that exhausts all of our time, so we will take the case as submitted. Counsel are excused. Thank you for these arguments. A very interesting case. Thank you. We'll take a short break.